UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| J & J SPORTS PRODUCTIONS, INC.,<br><br>　　　　　Plaintiff,<br><br>　　v.<br><br>MICHAEL D. PARAYNO,<br><br>　　　　　Defendant. | Case No. C-12-01704 PJH<br><br>**REPORT AND RECOMMENDATION RE MOTION FOR DEFAULT JUDGMENT**<br>**[Docket No. 11]** |

## I.  INTRODUCTION

Plaintiff J & J Sports Productions, Inc. ("J & J"), brought this action under 47 U.S.C. § 605 and 47 U.S.C. § 553, alleging that Defendant Michael Parayno unlawfully intercepted and displayed a broadcast to which J & J holds distribution rights.  Parayno did not appear and default was entered against him by the Clerk on June 28, 2012.  J & J now brings an Application for Default Judgment by the Court ("Motion") against Parayno and the Motion was referred to the undersigned magistrate judge for a Report and Recommendation.  A hearing on the Motion was held on September 21, 2012.  Plaintiff filed supplemental materials in support of the Motion on October 22, 2012.  For the reasons stated below, it is recommended that the Motion be GRANTED.

## II.  BACKGROUND

### A. Complaint

J & J is a California corporation with its principal place of business located in Campbell, California. Complaint ¶ 6.  J & J filed the Complaint in this action on April 5, 2012.  In the Complaint, J & J alleges that Defendant Michael Parayno is:

>An owner, and/or operator, and/or licensee, and/or permittee, and/or person in charge, and/or an individual with dominion, control, oversight and management of the commercial establishment doing business as Birdland Jazz Club a/k/a Berkeley Rustic Birdhouses operating at 1733 Sacramento Street, Berkeley, California 94702.

Complaint ¶ 7.  J & J alleges, on information and belief, that Parayno had the right and ability, as well as the obligation, to supervise the activities of Birdland Jazz Club a/k/a Berkeley Rustic Birdhouses on the night of April 9, 2012.  Complaint ¶¶ 10-11.  J & J also alleges that the actions of the employees of Birdland Jazz Club a/k/a Berkeley Rustic Birdhouses on the night of April 9, 2012 are imputable to Parayno by virtue of his ownership of Birdland Jazz Club a/k/a Berkeley Rustic Birdhouses.  Complaint ¶ 11.

J & J alleges that it was granted the exclusive nationwide commercial distribution (closed-circuit) rights to *Action Heros:  Erik Morales v. Marcos Maidana* ("the Program"), telecast nationwide on Saturday, April 9, 2012.  Complaint ¶ 14;  *see also* Plaintiff's Affidavit in Support of Plaintiff's Motion for Default Judgment and Request for Supplemental Briefing ("Gagliardi Supp. Decl."), Ex. 1 (license agreement).  According to J & J, it entered into sublicensing agreements with various commercial entities giving them the right to publicly exhibit the program in their commercial establishments.  Complaint ¶ 15.  According to J & J, Parayno unlawfully intercepted the Program and displayed it in his commercial established at the time of its transmission, on April 9, 2012.  *Id*.  ¶ 17.

J & J alleges that the unlawful interception was "done willfully and for purposes of direct and/or indirect commercial advantage and/or private gain."  Complaint ¶ 18.  J & J alleges on information and belief that the unlawful broadcast of the Program "resulted in increased profits for Birdland Jazz Club a/k/a Berkeley Rustic Birdhouses."  Complaint ¶ 12.

J & J asserts four claims in its complaint: 1) violation of  47 U.S.C. § 605(a); 2) violation of  47 U.S.C. § 553; 3) conversion; and 4) violation of California Business and Professions Code §§ 17200 *et seq.*  Plaintiff requests statutory damages in the amount of $110,000[1] for Defendant's alleged violation of 47 U.S.C. § 605(a), $60,000 for Defendant's alleged violation of 47 U.S.C. §

---

[1] The Court notes that in the body of the complaint, J & J request $100,000 in damages on this claim but that in the prayer at the end of the complaint, it requests $110,000 in damages on this claim.

2

553, unspecified compensatory, exemplary and punitive damages on its conversion claim, and restitution and injunctive relief on its Section 17200 claim. It also requests an award of reasonable attorneys' fees and costs on all of its claims.

**B. The Motion**

In the Motion, J & J requests that the Court enter a default judgment against Defendants and award the following: 1) $110,000.00 in statutory damages for the alleged violation of 47 U.S.C. § 605; and 2) $1,200.00 in damages on the conversion claim. In support of the Motion, Plaintiff filed a sworn declaration by Gary Gravlyn ("Gravlyn Affidavit") stating that he visited Birdland Jazz Club on April 9, 2012 at 6:20 pm, and that he observed a "large projector screen" displaying the Program on the back wall. He described the establishment as a "large . . . garage [that had been converted] into a public jazz club," with a "jazz sign and piano located in the corner." He stated that the capacity of the establishment was 75 but there were only 7 people in the establishment when Gravlyn was there. He stated that a cable box was not visible and the "establishment . . . does not have a satellite dish."[2]

Following the Motion hearing, Plaintiff submitted supplemental materials in support of the Motion, including an affidavit by Joseph M. Gagliardi, President of J & J, attesting to the fact that J & J "purchased and retains the exclusive commercial exhibition licensing rights" to the Program, that J & J marketed the sub-licensing commercial exhibition rights to commercial customers, and that J & J did not sublicense the Program to Defendant. Plaintiff's Affidavit in Support of Plaintiff's Motion for Default Judgment and Request for Supplemental Briefing ("Gagliardi Affidavit"), ¶¶ 3, 7. Gagliardi stated that for a commercial establishment with a maximum fire code occupancy of fewer than 75, the sublicense fee for the Program would have been $1,200.00. Id., ¶ 8. Attached to the Gagliardi Affidavit is the licensing agreement giving J & J the right to sublicense the Program, as well as the rate card for the Program showing that the

---

[2] J & J also attached to its motion a description of Birdland Jazz Club by a musician who apparently performed there, Oscar Pangilinan, on the web page www.oscarpangilinan.com. The pages were printed on April 10, 2011. Because these web pages were not adequately authenticated, the Court does not consider them. In any event, these pages are not necessary to the resolution of Plaintiff's motion.

3

sublicensing fee for the Program was $1,200 for a commercial establishment that could lawfully accommodate up to 100 people. *Id*., Exs. 1 & 2.

In his affidavit, Gagliardi also explains that the programming that J & J sublicenses "is *not* and *cannot* be mistakenly, innocently or accidentally intercepted . . . because [it] is encrypted and it is only after [J & J] authorize[s] a commercial activation that a commercial establishment may broadcast [J & J's] signal." *Id*., ¶ 8 (emphasis in original). Gagliardi describes the various methods that can be used to pirate its programming, including use of a "blackbox" or "smartcard" to unscramble the programs, "purposeful misrepresentation of a commercial establishment as a residential property to allow the fraudulent purchase of pay-per-view . . .programming at the residential rate," the use of illegal cable drop or splice from and adjacent home or apartment to divert a program to a commercial establishment, and "[t]he purchase of other illegal unencryption devices." *Id*., ¶ 10. Gagliardi further explains that although his company is known as a "closed-circuit distributor" – based on the fact that it used to transmit programming on a closed-circuit basis – its role now is only to license the display of programming to commercial customers and to direct programming providers such as Comcast Cable or Directv, to provide an unencrypted signal to customers. *Id*. ¶ 11. According to Gagliardi, the "[t]he persistent signal piracy of our programming costs our company, our customers, and their communities, millions of dollars annually resulting, in significant part, from the perceived lack of significant consequences (including nominal or minimal damages awarded by the Courts that hear our cases). *Id*., ¶ 13.

In its supplemental brief, J & J contends that although it is "unaware of [Defendant's] particular programming provider" due to Defendant's failure to appear, if Defendant had a residential account with the programming provider "there can be no question he violated Plaintiff's rights by procuring the Program and distributing it in a commercial setting." Plaintiff's Supplemental Brief ("Supp. Brief") at 3 (citing *Integrated Sports Media, Inc. v. Lopez*, Case No. C-10-00304 JVS-RNB (C.D. Cal. July 18, 2011)). Even if Defendant had a commercial account, J & J contends, it violated J & J exclusive rights because it did not receive express authorization from J & J to display the Program. *Id*. (citing Riley Decl., Ex. A at 15 (Section 21.1 of Comcast Terms of Service commercial customer agreement, specifying that commercial customers are

prohibited from distributing pay-per-view video programming, including sporting events, without the express written authorization of the event distributor)). [3]

## III.   ANALYSIS

### A.  Legal Standard Regarding Entry of Default Judgment

Pursuant to Rule 55(b)(2) of the Federal Rules of Civil Procedure, the court may enter a default judgment where the clerk, under Rule 55(a), has previously entered the party's default based upon failure to plead or otherwise defend the action. Fed. R. Civ. P. 55(b). Once a party's default has been entered, the factual allegations of the complaint, except those concerning damages, are deemed true. Fed. R. Civ. Proc. 8(b)(6); see also *Geddes v. United Fin. Group*, 559 F.2d 557, 560 (9th Cir. 1977) (stating the general rule that "upon default[,] the factual allegations of the complaint, except those relating to the amount of damages, will be taken as true"). A defendant's default, however, does not automatically entitle the plaintiff to a court-ordered default judgment. *Draper v. Coombs*, 792 F.2d 915, 924-25 (9th Cir. 1986).

"Granting or denying a motion for default judgment is a matter within the court's discretion." *Landstar Ranger, Inc. v. Parth Enterprises, Inc.*, 2010 WL 2889490, at *2 (C.D. Cal. Jul.19, 2010) (quoting *Elektra Entertainment Group Inc. v. Bryant*, No. CV 03-6381 GAF (JTLx), 2004 WL 783123, at *1 (C.D. Cal. Feb.13, 2004)). The Ninth Circuit has directed that courts consider the following factors in deciding whether to enter default judgment:

> (1) the possibility of prejudice to plaintiff; (2) the merits of plaintiff's substantive claim; (3) the sufficiency of the complaint; (4) the sum of money at stake in the action; (5) the possibility of a dispute concerning the material facts; (6) whether defendant's default was the product of excusable neglect; and (7) the strong public policy favoring decisions on the merits.

*Eitel v. McCool*, 782 F.2d 1470, 1471-72 (9th Cir.1986).

---

[3] In its Supplemental Brief, J & J also argued that print-outs of web pages that had been submitted in support of the Motion to provide information about Birdland Jazz Club carried sufficient indicia of authenticity to render the information contained in them reliable. The Court finds nothing in the web pages offered by J & J that allows it to determine whether the information contained in them is reliable and therefore does not consider that information here.

### B. Merits of J & J's Substantive Claims

#### 1. Claims Under 47 U.S.C. § 605 and § 553

J & J asserts claims under both 47 U.S.C. § 605 and 47 U.S.C. § 553, but it seeks to recover only under the former provision, which allows for the award of higher statutory damages than does the latter.[4]

Section 553 prohibits a person from "intercept[ing] or receiv[ing] or assist[ing] in intercepting or receiving any communications service offered over a cable system, unless specifically authorized to do so by a cable operator . . . ." 47 U.S.C. § 553(a)(1). In other words, that section prohibits unauthorized reception of cable programming. Section 605 prohibits unauthorized reception of programming by "wire or radio." 47 U.S.C. § 605(a). Judge Whyte, of this district, explains the relationship between the two provisions as follows:

> Despite the broad phrasing of section 605 (which dates back to 1934), it is not coextensive with section 553. *United States v. Norris*, 88 F.3d 462 (7th Cir.1996). As explained in a thorough opinion by the Seventh Circuit, "cable television programming transmitted over a cable network is not a 'radio communication'" under section 605. *Id.* at 469; *see also TKR Cable Co. v. Cable City Corp.*, 267 F.3d 196 (3d Cir.2001) (endorsing *Norris* and further explaining the distinction between sections 553 and 605). A signal pirate violates section 553 if he intercepts a cable signal, he violates section 605 if he intercepts a satellite broadcast. But he cannot violate both by a single act of interception.

*J & J Sports Productions, Inc. v. Manzano*, 2008 WL 4542962, at *2 (N.D. Cal., Sept. 29, 2008).

Here, J & J has included no specific allegations in the complaint addressing whether Defendant intercepted a cable signal or a satellite broadcast. The Gravlyn Affidavit, however, affirmatively states that there was no satellite dish. Therefore, the Court concludes that liability should be found only under 47 U.S.C. § 553 and not under § 605. This conclusion finds further support in decisions by a number of judges in this district addressing the question of whether to apply § 553 or § 605 where a plaintiff seeking default judgment is unable to determine the method

---

[4] Statutory damages for violations of § 553 are between $250 and $10,000 per violation while statutory damages for violations of § 605 are between $1,000 and $10,000. Enhanced damages for willful violation of § 605 may be up to $100,000, while enhanced damages for willful violations of § 553 are capped at $50,000. Both provisions give the court authority to reduce the statutory award where the court finds that the defendant was not aware of and had no reason to believe his acts constituted a violation. Under § 553, statutory damages may be reduced to $100 per violation; under § 605 statutory damages may be reduced to $250.

of interception.  In those cases, the court has reasoned that § 553 should be applied rather than § 605 because "cable boxes are more easily hidden and more likely to be the source of transmission."  *J & J Sports Productions, Inc. v. Basto*, 2011 WL 2197756, at *3 (N.D.Cal., 2011) (Hamilton, J.) (holding on a motion for default judgment that "[b]ecause neither a cable box nor satellite dish was visible at defendants' establishment, the court follows the reasoning of other judges in this district who have entered judgment and awarded damages under section 553 rather than section 605 based on the understanding that cable boxes are more easily hidden than satellite dishes and more likely to be the source of transmission."); *see also J & J Sports Productions, Inc. v. Mosley*, 2011 WL 2066713 (N.D.Cal., April 13, 2011) (Wilken, J.) (same); *J & J Sports Productions, Inc. v. Guzman*, 2010 WL 4055934, at *2 (N.D.Cal., October 14, 2010) (Fogel, J.) (same*);  J & J Sports Productions, Inc. v. Man Thi Doan*, 2008 WL 4911223, at * 3 (N.D.Cal., November 13, 2008) (Whyte, J.) (same); *J & J Sports Productions, Inc. v. Ro*, 2010 WL 668065, at * 3 (N.D.Cal., Feb. 19, 2010) (Alsup, J.) (same and noting that if plaintiff had wanted to prove a violation of section 605 it could have filed a third-party subpoena or requested an order for inspection).  The undersigned finds the reasoning of these cases persuasive.  Therefore, this factor favors entry of default judgment as to the alleged violation of 47 U.S.C. § 553 but not as to the alleged violation of  47 U.S.C. § 605.

### 2. Conversion Claim

A conversion claim requires "ownership or right to possession of property, wrongful disposition of the property right and damages."  *G.S. Rasmussen & Assocs., Inc. v. Kalitta Flying Serv., Inc.*, 958 F.2d 896, 906 (9th Cir. 1992).  As J & J's allegations must be accepted as true, they support the three elements of a conversion claim.  In particular,  J & J has alleged that it owns the licensing rights to the Program, that Defendant displayed the program without authorization and that Defendant would have had to pay J & J a sublicensing fee to display the Program at its commercial establishment.  Further, J & J has presented evidence of these three elements, as well as a rate card showing that the applicable sublicensing fee would have been $1,200.  *See* Gravlyn Affidavit & Gagliardi Decl., Exs. A and B.   Therefore, this factor favors entry of default judgment as to Plaintiff's conversion claim.

### 3. Section 17200 Claim

Although J & J included an unfair competition claim in its complaint, it did not address that claim in its Motion; nor did it request an award of damages on the claim. Accordingly, it is recommended that the Section 17200 claim be dismissed with prejudice.

### C.   Remaining *Eitel* Factors

The remaining *Eitel* factors, on balance, support entry of default judgment on J & J's § 553 and conversion claims. While there is a strong policy favoring decision of cases on the merits, that policy consideration is outweighed here by the prejudice that would result from denial of default judgment, which would leave J & J without a remedy. *See J & J Sports v. Basto*, 2011 WL 2197756, at *4 (N.D. Cal. June 6, 2011). Although the amount of money at stake is not insignificant, the Court does not find that this factor weighs against entry of default judgment as the amount that the Court recommends should be awarded is proportionate to the damages suffered and the need for deterrence of piracy, discussed further below. Finally, there is no indication that Defendants' failure to appear is due to excusable neglect. Therefore, default judgment should be entered as to J & J's § 553 and conversion claims.

### D.   DAMAGES

#### 1. Statutory Damages

J & J seeks $110,000 in damages under 47 U.S.C. § 605. As discussed above, the Court concludes that the complaint supports liability under Section 553 but not under Section 605. Section 553 provides for statutory damages of "not less than $250 or more than $10,000" for a violation of section 553(a) and enhanced damages up to $50,000 for a willful violation. 47 U.S.C. § 553(c)(3)(A)(ii), (B). A review of recent decision in this district involving default judgment motions in cases brought by J & J under §§ 553 and 605 is instructive.

In *J & J Sports Productions, Inc. v. Lozano*, 2012 WL 3660351 (N.D.Cal., Aug. 24, 2012), the defendant was the owner of an establishment called Pampangas Cuisine. The investigator stated that the capacity of the establishment was 35 but that he counted only 25 people during his visit; he further stated that there was no cover charge to enter and that the unauthorized program was displayed on one television set. 2012 WL 3660351, at * 1. The

investigator did not note whether there was a cable box or satellite dish. *Id*. The court awarded $250.00 in statutory damages for the violation, under § 553.

In *J & J Sports Productions, Inc. v. Man Thi Doan*, the defendants operated a pizza parlor that showed a program to which J & J held distribution rights. 2008 WL 4911223, at * 1 (N.D. Cal. Nov. 13, 2008). The pizza parlor could seat 50 people, but the investigator counted 30 people there when the unauthorized broadcast was being shown. *Id*. at *2. There is no indication that a cover was charged or that the defendant had engaged in similar past conduct. The court noted that the amount it would have cost to view the broadcast legally was not included in the papers. *Id*., at *3. The court awarded $2,500.00 in damages under § 553, finding that this amount would have a deterrent effect. *Id*., at * 4.

In *J & J Sports Productions, Inc. v. Basto*, the defendant operated a restaurant that showed a program to which J & J held distribution rights. 2011 WL 2197756, at * 1 (N.D. Cal. Jun.6, 2011) (Hamilton, J.). The investigator counted 83 patrons and no cover was charged. Id., at * 5. The capacity of the establishment was 150 people. *Id*., at * 1. The sublicensing fee to show the broadcast at an establishment of that size would have been $4,200.00. The court awarded $5,000.00 for the violation of Section 553 and an additional $2,000.00 in enhanced damages, taking judicial notice of several other cases in which damages had been awarded, on default judgment, against the same defendant for similar violations. *Id*. at *4. The court noted that "defendants are not first-time offenders but have illegally intercepted several different transmissions." *Id*. However, it declined to award the maximum award of damages "[b]ecause the interception challenged in this action occurred before dismissal or judgment was entered in the other lawsuits, [and therefore] plaintiff ha[d] not demonstrated that the adverse outcome of its other enforcement actions ha[d] failed to deter defendants from further illegal activity." *Id*.

In *J & J Sports Productions, Inc. v. Mosely*, the defendants operated a restaurant that showed a program to which J & J held distributions rights. 2011 WL 2066713, at * 1 (N.D.Cal., April 13, 2011). The investigator was not charged a cover and counted 17 people in the restaurant. *Id*. There was no evidence that the defendants were "repeat offenders." Id, at *6. The sublicensing fee would have been $2,200.0. *Id*. at *5. The court awarded $2,500.00 in

9

1   statutory damages, looking to "the cost of a commercial license for the program at issue . . . , [the]
2   [d]efendant's incremental profits, and the need to deter piracy." *Id*.  Because there was no cover
3   charge, no premium charged on food and drink and little advertising, and the show was displayed
4   to only 17 patrons on a single television, the court concluded that the defendants' incremental
5   profits were likely modest.  *Id.*  The court also awarded $2,500.00 in enhanced damages on the
6   basis that although Defendants were not repeat offenders, their conduct was willful.  *Id*., at *7.

7       Finally, in *J & J Sports Productions v. Parayno* (Case No. C-12-2223), 2012 WL 3277279
8   (N.D.Cal., Aug. 10, 2012), Judge Illston awarded $5,200 in statutory damages to J & J
9   productions on a motion for default judgment against the same defendant as in this case.  That
10  case was based on an unauthorized display at Birdland Jazz and BBQ of another program to
11  which J & J held sublicensing rights, on May 7, 2011, just a few weeks after the Program at issue
12  in this case.  2012 WL 3277279, at * 1. The investigator's declaration in that case stated that he
13  had paid a $20 cover charge, that there were 30 people in the establishment, and that the broadcast
14  was displayed with a large projector on the back wall.  *Id*.  The sublicensing fee for the broadcast
15  was $2,200.  *Id.*  The court declined to award enhanced damages, noting that in this District, courts
16  generally have awarded damages "slightly over the statutory minimum" in the absence of a
17  showing of egregious conduct.  *Id*. at *2 (citation omitted).

18      In this case, the cover charge paid by the investigator was $10, there were only 7 people
19  present and the sublicensing fee was $1,200, suggesting that a somewhat lower award of statutory
20  damages is appropriate here as compared to the amount awarded against the same defendant by
21  Judge Illston.  The Court notes that J &J did not cite the case recently decided by Judge Ilston as a
22  basis for awarding enhanced damages in this action;  nor would such an award appropriate.   The
23  interception at issue in this case occurred long before judgment was entered by Judge Illston.
24  Indeed, J & J did not file the complaint in that case until many months after the interception that
25  is the basis for the complaint in this case had occurred.  Therefore, for the reasons set forth in
26  *Basto*, the judgment based on the May 7, 2011 interception does not establish that an award of
27  enhanced damages in this action is necessary to deter wrongful conduct on the part of Defendant.
28

Accordingly, it is recommended that the Court award $4,000 in statutory under § 553(c)(3)(A)(ii) and deny J & J's request for enhanced statutory damages under § 553(c)(3)(B).

### 2. Conversion Damages

J & J requests $1,200 in damages on its conversion claim, asserting in the Motion that this is the amount of the licensing fee Birdland Jazz Club would have had to pay to display the Program in its establishment. J & J has provided evidence of the amount of the sublicensing fee and therefore, this amount should be awarded in full.

## IV. CONCLUSION

The Court recommends that the Motion be GRANTED as to Plaintiff's claim under 47 U.S.C. § 553 and its claim for conversion. Default judgment should be awarded in favor of J & J and Plaintiff should be awarded: 1) $4,000 in statutory damages under 47 U.S.C. § 553(c)(3)(A)(ii); and 2) $1,200 on its conversion claim. Plaintiff's claims under 47 U.S.C. § 605 and Cal. Bus. & Prof. Code Section 17200 should be dismissed with prejudice. Pursuant to Fed. R. Civ. P. 72(a), any objection to this Report and Recommendation shall be filed no later than November 29, 2012.

Dated: November 15, 2012

_____
Joseph C. Spero
United States Magistrate Judge

11